J-S12016-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: BUCKS COUNTY CHILDREN AND YOUTH SOCIAL SERVICES AGENCY | : : : : : : | |
| | : | No. 2078 EDA 2020 |

Appeal from the Order Entered October 30, 2020
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-DP-0000156-2018

BEFORE: LAZARUS, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.: **FILED JULY 07, 2021**

Bucks County Children and Youth Social Services (CYS) appeals from the order, entered pursuant 42 Pa.C.S. § 6351, and directing CYS to engage and pay for the services of a life care planner for A.M. (Child),[1] the son of D.M. (Father) and J.M. (Mother). For the reasons that follow, we affirm.

Subsequent to the filing of a dependency petition on September 20, 2018, the trial court adjudicated Child dependent on October 10, 2018, and placed him in the legal and physical custody of CYS.[2] **See** Order of

---

[1] Child was born in March of 2009.

[2] Upon review, CYS had been involved with the family since 2017 due to issues of substance abuse and domestic violence. **See** Order of Adjudication & Disposition, Findings of Fact, 10/10/18, at ¶ h; **see also** Dependency Pet., 9/20/18, at ¶ h.

Adjudication & Disposition, 10/10/18.  Child was placed with Woods Services, a residential facility.  *Id.* at ¶ 11(c).  As noted by the trial court, Child

> suffer[s] from cognitive impairment, cerebral palsy, and severe developmental delays[, and] lacks the ability to perform many daily life activities, including the ability to use a toilet, the ability to feed himself, and the ability to speak.  [Child] currently requires full-time care at Woods Services, a twenty-four[-]hour facility for children with intellectual or developmental disabilities.

Trial Ct. Op., 12/10/20, at 1-2; *see also* N.T., 10/14/20, at 4-5, 11-12; Order of Adjudication & Disposition, Findings of Fact, 10/10/18, at ¶ a.

On October 14, 2020, the trial court held a status review hearing. Mother and Father appeared with their respective counsel.  Child was represented by a guardian *ad litem*.[3]  At the time of the hearing, Child remained in CYS's legal and physical custody of remained with Woods Services,[4] and the goal was reunification with a concurrent plan for adoption. *See* Permanency Review Order, 6/30/20.

During the hearing, Father stated that "[e]verything is good in life right now," that he and Mother were approaching one year of sobriety, and that he was working full-time.  N.T., 10/14/20, at 4-5.  Father continued that he and Mother:

_____

[3] We observe that the guardian *ad litem* submitted a brief to this Court in favor of the court's order engaging a life care planner.

[4] We note that while it appears that Child has remained with Woods Services throughout the dependency proceedings, some of the motions for permanency review and permanency review orders refer to foster care.

had a bit of a concern.  I mean, we both want him to come home, but we're not really sure if that is, like, maybe the best decision right now for where we're at.  We have to get all the services put in place.  And not that he's a burden, but he needs 24-hour care. . . .

*Id.* at 5.

Mother described difficulties in communicating with Woods Services.  *Id.* at 8.  Specifically, Mother noted that she called the facility twice "to try to figure out funding for that[,]" apparently referring to funding for Woods Services.  *Id.*

The trial court then engaged in a discussion with the CYS case worker about funding, noting that it would not return Child to Parents until the court was "comfortable that [Parents] have the funding in place to care for [Child]." *Id.* at 10.  After hearing that Woods Services cost approximately $400 per day, the trial court engaged in the following exchange with CYS's counsel:

THE COURT: Is there a cerebral palsy foundation to reach out to for grants to the family to help relieve some financial burden?

I'm going to require, before I make a decision with regard to returning [Child], as to whether or not they can financially take care of [Child] through grants, fundings, programs, [CYS] will be able to do it.

[CYS's Counsel]: Your Honor, if I may, and I don't know whether this would be a problem in getting funding, but I am aware that [Child] has received a settlement at some point in time in the past that is quite substantial I believe either upwards of over a million dollars. It's in a trust fund for him.

THE COURT: Let's assume that to be correct, he can't touch it till he's 18 years old.

[CYS's Counsel]: There is an institutional --

THE COURT: Called a special needs trust.

- 3 -

[CYS's Counsel]: There's an institutional trustee who --

THE COURT: A special needs trust the child has no right to use the money except for a limited basis based on what was set up with the special needs trust. I've done hundreds of these as a practitioner.

[CYS's Counsel]: I'm not suggesting that isn't the case, Your Honor. I'm suggesting that there may be some difficulty in with the parents, who we hope are able to get funding and get [Child] home.

THE COURT: Parents can't get a dime. Parents on a special needs trust cannot get a dime, and that's why they appointed independent trustees to manage the money.

[CYS's Counsel]: I'm not suggesting they can, Your Honor. What I'm saying is there may be some difficulty with them getting funding because of the existence of that trust.

\* \* \*

[CYS's Counsel]: . . . I wonder if, [the CYS case worker], could you tell what [CYS] has done to try to locate possible financial assistance for the parents if and when [Child] goes home?

THE COURT: You don't have to tell me now. You have to tell me, when you're trying to move this child back home or the parents -- I thought I said this earlier -- trying to get [Child] back home.

I'm going to want evidence bringing in fund managers, et cetera, explaining what they can do to provide financing that would be sufficient for [Child] to be wherever it is that you I are trying to do. I don't need it now.

I'm making that directive pretty clear. If the parents want to move [Child] back to their home, they have a right to make that motion. And I will take into consideration all the evidence that they present as to how they're going to fund [Child].

Because as we always know, it's always about do they have the ability to be able to provide for [Child]. This is a child that's going to have million[s] of dollars over the course of his lifetime.

Also, to give both of you a heads up as to what you should probably be doing, you should probably get a life care planner and

- 4 -

have that person do a study. In fact, I'm going to order the [CYS] to do it.

They are to get a life care planner, which is an expert in projecting costs for future life expectancies of children and have them do a complete report projecting over the course of [Child's] life.

They review the medical records, they talk to the physicians, they talk to the therapists, they come with a plan saying they need X number of dollars a day so many days a year. When they get older, these things are going to happen, and they can project your plan as to what it would cost over the lifetime of [Child].

That will occur if you were involved in civil litigation trying to make sure, when you're trying to litigate a case, you get sufficient funds to provide for the lifetime, and they made a contingency whether he has a short lifetime or not, they will go into the life expectancy as well.

It usually takes about 90 days once you retain the life care planner. If you need to obtain a life care planner, I'm sure there's a number of plaintiff's attorneys that people know that they can ask someone who has done this kind of work and they will get you life care planners.

[CYS's Counsel]: Understood.

THE COURT: I want that report in three months if that's possible.

[CYS's Counsel]: Thank you, Your Honor.

THE COURT: The parents will have an idea of the costs that would be needed to take care of the child, and they break it down year by year or like age three to five, five to 12, so they take five to whatever, then adulthood. They will lose these benefits that he has. He may have these things. He is getting Social Security benefits?

[CYS Case Worker]: Yeah, he has medical assistance.

THE COURT: Besides medical assistance?

[CYS's Counsel]: Just social security does he receive social security disability?

[CYS Case Worker]: No.

THE COURT: Does he qualify for it?

[CYS Counsel]: I don't know whether the parents ever applied.

[Father]: My wife had applied for it when he was a child, got denied. We tried once or twice.

[Mother]: When he was younger, I did try getting social security, it was denied. I haven't tried any recent time.

THE COURT: I don't know the requirements that's clearly about Social Security disability for a 12-year old that is permanently disabled. You may want to see if there's some way he gets qualified for that, get certain income, help support and offset the expenses.

But the life care planner will also be able to help you in that regard as to other sources of funding. So I look forward to getting that report in the next 90 days. [CYS] will bear the costs of that report as well as all costs associated with gathering all the records that the life care planner is going to need, which will be a little expensive.

Don't be surprised if this report doesn't cost [CYS] between five and $10,000. They will interview the family, they will go to Woods, they will interview the people at woods. That's an extensive process. It gives you a good indication of what the economics are for a 12-year old with these kinds of disabilities.

[CYS's Counsel]: Your Honor, may I get an order to that effect?

THE COURT: Sure . . . .

*Id.* at 12-19.

By the order dated October 29, 2020, and entered October 30, 2020, the trial court issued a written order memorializing its verbal order for a life care planner. The court explained:

On October 14, 2020, this [c]ourt ordered [CYS] to engage and pay for a life care planner, a specialist in determining the immediate and long-term cost of caring for a special-needs person. This [c]ourt stated it required the report of a life care planner in order to determine whether the parents could provide the necessary parental care to [Child]. While acknowledging the cost associated with a life care planner, this [c]ourt felt

- 6 -

uncomfortable making a determination as to [Child]'s best interests without expert consultation.

Trial Ct. Op. at 2-3.

Thereafter, on November 10, 2020, CYS filed a timely notice of appeal, as well as concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

On appeal, the CYS raises the following issue for our review:

Did the [trial] court err and abuse its discretion by directing [CYS] to engage and pay for the services of a life care planner for the subject child?

CYS's Brief at 4 (some capitalization omitted). Before addressing CYS's arguments in this appeal, we first consider this Court's appellate jurisdiction and whether CYS properly objected to the trial court's ruling.

_____

[5] In a joint motion filed March 12, 2021, Mother and Father requested this Court to quash the appeal contending that CYS failed to properly serve them with their appellate brief, CYS's brief is defective, CYS's Rule 1925(b) statement of errors is not adequately specific, and CYS failed to file a designation or reproduced record. Mother and Father assert that CYS's brief fails to cite to the record and to where issues were preserved for review, CYS's brief fails to cite to pertinent authority, the summary of argument is devoid of discussion, and the argument is not properly divided. *See* Joint Appl. of Mother and Father to Quash Appeal for Violations of Rules of Appellate Procedure that Preclude Effective Appellate Review, 3/12/21.

Pursuant to order of March 26, 2021, this Court denied the motion without prejudice to the moving parties' rights to again raise this issue, if properly preserved, in their briefs, or, if the briefs have already been filed, then in new applications that may be filed after the appeal has been assigned to the panel of this Court that will decide the merits of the appeal. *See* Order, 3/26/21. As Mother and Father failed to file a brief where they re-raised these issues or failed to file a subsequent motion re-raising these issues, we decline to re-address them.

## Jurisdiction

"Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review plenary." ***In the Interest of J.M.***, 219 A.3d 645, 650 (Pa. Super. 2019) (citation and quotation marks omitted). "In order to be appealable, the order must be: (1) a final order, Pa.R.A.P. 341-42; (2) an interlocutory order appealable by right or permission, 42 Pa.C.S. § 702(a)-(b); Pa.R.A.P. 311-12; or (3) a collateral order, Pa.R.A.P. 313." ***Id.*** (footnote omitted).

> The collateral order doctrine exists as an exception to the finality rule and permits immediate appeal as of right from an otherwise interlocutory order where an appellant demonstrates that the order appealed from meets the following elements: (1) it is separable from and collateral to the main cause of action; (2) the right involved is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost.

***Id.*** at 655 (citations omitted and formatting altered).[6]

In ***In re J.R.***, 875 A.2d 1111 (Pa. Super. 2005), the Philadelphia Department of Human Services (DHS) appealed from an order that directed DHS to provide home telephone service to the child's father. ***J.R.***, 875 A.2d at 1113. The child's father was required to call DHS and confirm in advance his attendance for supervised visits with the child. ***Id.*** If the father did not

---

[6] The ***J.M.*** Court addressed whether an order prohibiting visits at the mother's home was an appealable order. ***J.M.***, 219 A.3d at 649-50. The ***J.M.*** Court quashed the appeal because the order was not a final order or a collateral order. ***Id.*** at 649, 661.

call DHS in advance, DHS would cancel the father's visits.  *Id.*  The trial court *sua sponte* ordered DHS to provide home telephone service.  *Id.*  DHS objected and suggested alternatives that the trial court did not entertain.  *Id.*  DHS filed a post-trial motion for reconsideration, which the trial court denied, and DHS appealed.  *Id.*

In resolving the appealability of the trial court's order, the Court held that the interlocutory order was appealable under the collateral order doctrine for the following reasons:

> First, the order for telephone service is separable from and collateral to the main cause of action, which is the dependency determination and disposition.  Second, the right involved is DHS's discretion to determine allocation of limited resources.  This is a right too important to be denied review.  Third, if review is postponed and DHS ultimately prevails, it is unlikely that the agency will be able to recoup the funds paid out pursuant to the court order.

*Id.* at 1114 (citations omitted).  Thus, the Court held that the order was appealable under the collateral order doctrine, and we had jurisdiction to review the merits of the appeal.  *Id.*

Instantly, as stated by the trial court, "[a]lthough not a final order, this [c]ourt's order is procedurally appealable under the collateral order doctrine." Trial Ct. Op. at 3 n.7 (citation omitted).  Under the ruling in *J.R.*, we find the following regarding the order on appeal in this dependency case: (1) it is separable from and collateral to the main cause of action (*i.e.*, Child's dependency and disposition); (2) the right involved is too important to be denied review the CYS's obligation to spend its limited resources on paying for

a life care planner); and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost (*i.e.*, CYS will have already paid for the acquisition of a life care planner, and CYS will be unable to recoup those funds if CYS prevails on appeal). As such, we agree with the trial court that the order is appealable as a collateral order.

### Waiver

It is well settled that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In *In re L.V.*, 209 A.3d 399 (Pa. Super. 2019), the Court found the mother waived one of her issues for the following reasons:[7]

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*Id.* at 418 (citation omitted and formatting altered); *see also In re A.W.*, 187 A.3d 247, 252-53 (Pa. Super. 2018) (holding that because the parents' counsel failed to timely object before the trial court, the parents waived their

---

[7] In *L.V.*, the mother contended the trial court erred by delaying the scheduling of the dependency hearing. *L.V.*, 209 A.3d at 418.

issue that the trial court violated their right to due process because, among other reasons, "the juvenile court's interruptions made it impossible [for the parents'] counsel to 'make any argument which the court would entertain'").

With respect to the requirement for a contemporaneous objection, our Supreme Court has explained:

> Appellate court consideration of issues not raised in the trial court results in the trial becoming merely a dress rehearsal. This process removes the professional necessity for trial counsel to be prepared to litigate the case fully at trial and to create a record adequate for appellate review. The ill-prepared advocate's hope is that an appellate court will come to his aid after the fact and afford him relief despite his failure at trial to object to an alleged error. The diligent and prepared trial lawyer—and his client—are penalized when an entire case is retried because an appellate court reverses on the basis of an error opposing counsel failed to call to the trial court's attention.

*Dilliplaine v. Lehigh Valley Tr. Co.*, 322 A.2d 114, 116 (Pa. 1974).

Instantly, CYS failed to specifically raise any objection in the court below related to the court's order for them to engage a life care planner. CYS failed to object on the record to the verbal order. To the contrary, CYS's counsel asserted that he "understood" the court's directive that CYS pay for a life planner and requested the order once the court set forth its request. *See* N.T., 10/14/20, at 15-19. As such, because CYS failed to raise a timely objection in the court below, the issue is waived. *See* Pa.R.A.P. 302; *L.V.*, 209 A.3d at 418; *A.W.*, 187 A.3d at 252-53; *see generally Dilliplaine*, 322 A.2d at 116. However, even if CYS preserved its issues in this appeal, we conclude that the trial court's order was appropriate.

**CYS Claims**

CYS contends that the trial court erred by *sua sponte* ordering CYS to pay for a life care planner, without notice and opportunities for CYS to consider alternatives and provide the court with more complete evidence in the case. *See* CYS's Brief at 7. CYS contends that the requirement for a life care planner "came like a bolt out of the blue." *Id.* at 8. CYS continues that the trial court unfairly criticized it for being unable to provide answers concerning the family's ability to finance Child's care. *Id.* at 7. CYS asserts that the trial court inaccurately stated that CYS wanted to be relieved of its obligation to pay for Child's care or attempt to return Child to Mother and Father. *Id.* at 6.

When reviewing a juvenile court's order requiring a child welfare agency to fund a particular service, we adhere to an abuse of discretion standard. *J.R.*, 875 A.2d at 1114. An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law. *Id.*

In *In re Tameka M.*, 580 A.2d 750 (Pa. 1990), the trial court ordered the agency to fund a dependent child's attendance at a Montessorian pre-school school, which was neither licensed nor funded by the Department of Public Welfare. *Tameka M.*, 580 A.2d at 751. The *Tameka M.* Court, cited, in relevant part, Section 6351(a) which gives the trial court authority to make disposition orders for dependent children which are "best suited to the [safety,] protection and physical, mental, and moral welfare of the child. . . ." *See id.* at 752-53. The Court then explained:

[U]nder our law, [the agency] has the duty to give financial support to dependent children, and Juvenile Court has the duty to act to provide for the "[safety,] protection and physical, mental and moral welfare" of a dependent child. This bestows on a dependent child the legal right to such care and treatment to be paid for by [the agency].

*Id.* at 755.

In *J.R.*, this Court reversed the trial court's order directing the agency to pay for telephone services for a parent. *J.R.*, 875 A.2d at 1118. The *J.R.* Court reasoned:

Our Supreme Court has held that [the agency] has a legal duty to give financial support to dependent children. But this duty cannot be interpreted as a mandate to provide the necessities of life to parents whose children have been adjudicated dependent. Nor can this duty be reoriented to give primacy to parents' direct needs. Rather, the needs of children who have been adjudicated dependent are, and must remain, the polestar. [The agency] has limited resources, and those resources must be focused on its central mission—to provide for the protection and welfare of dependent children. Similarly, while the court has broad discretionary authority under the Juvenile Act, its jurisdiction is limited by the needs and interests of the child.

We of course realize that providing a telephone—or a home or a job—to the parent of a child who has been adjudicated dependent would in many cases aid not only the parent but also the dependent child and promote family unity. In recognition of this fact, many services are available to parents to provide assistance and support for their efforts at reunification with their dependent children. Indeed, the Juvenile Act requires that "reasonable efforts" be made to reunify the family once a child has been declared dependent. *See* 42 Pa.C.S.[] §§ 6351(e) & (f). Nonetheless, the focus of the Juvenile Act is the dependent child, not the parent. The statute cannot sustain an interpretation that would allow the court to order parental services that do not directly promote the best interests of the child or that are beyond the statutory standard of "reasonable efforts" to reunify the family.

- 13 -

In ordering telephone service that would benefit Father without a finding that it would serve the dependent child's needs, interests, and welfare, the court committed an error of law.[fn5] We therefore vacate that portion of the juvenile court's order that directed DHS to provide home telephone service for [the f]ather.

> [fn5] Whether the provision of home telephone service falls into the category of "reasonable efforts" to reunify the family was not addressed by the juvenile court. By requiring only "reasonable efforts" to reunify a family, the statute recognizes that there are practical limitations to such efforts. 43 Pa.C.S.[] §§ 6351(e) & (f). It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a **reasonable** effort towards reunification. Under the facts of this case, we do not believe that provision of home telephone service constitutes a reasonable effort.

*Id.* at 1118 & n.5 (citations omitted and emphasis in original).

Here, in its opinion, the trial court explained its ruling issue on appeal as follows:

The Pennsylvania Juvenile Act bestows in juvenile courts the mandate to deploy orders that are "best suited to the safety, protection and physical, mental, and moral welfare of the child[.]" The essential purposes of the Juvenile Act guide juvenile courts in "provid[ing] for the care, protection, safety and wholesome mental and physical development of children" and "preserv[ing] the unity of the family whenever possible[.]" Juvenile courts must carefully consider a dependent child's specific circumstance and use that understanding to rule in the child's best interests. The legislative decrees contained within the Juvenile Act also impose on child welfare agencies "the legal duty to provide financial support for the care and treatment of a dependent child."

Previously, the Pennsylvania Appellate Courts have permitted juvenile courts to order child welfare agencies to pay for a panoply of expenditures related to a juvenile court's assessment of the child's best interest. In [**Tameka M.**], the Pennsylvania Supreme Court upheld a juvenile court's directive for a child welfare agency

- 14 -

to reimburse the parents of a dependent child for Montessori schooling when traditional schools were insufficient in meeting the specific demands of the child. In the Superior Court, the Court upheld orders directing child welfare agencies to pay for expenses, including a college stipend, dental treatment, and a laptop[,] when free alternatives were insufficient to meet the best interest of the child. In [*J.R.*]—a case where a juvenile court ordered the child welfare agency to pay for a father's telephone service to further the father's relationship with the dependent child—the Superior Court only reversed the juvenile court's order when the juvenile court did not consider cheaper alternatives that would also meet the child's best interest.

Here, [Child]'s medical condition and his dependent status impose on [CYS] a duty to determine the cost of future care to further [Child]'s best interests. Similar to the child in [*Tameka M.*], [Child]'s specific situation requires [CYS] to pay atypical expenditures to further the purposes of the [J]uvenile [A]ct. This [c]ourt understands [Child]'s unique circumstances require a life care planner's report before this [c]ourt can carefully order a final determination at a permanency hearing. [CYS]'s expertise does not reach to special-needs children in long-term twenty-four-hour care. Although the Juvenile Act tasks this [c]ourt with "preserv[ing] the unity of the family whenever possible[," CYS] needs to present specialized information so this [c]ourt can determine whether, in [Child]'s unfortunate case, successful reunification is possible.

This [c]ourt only ordered [CYS] to hire a life care planner only when [CYS] was unable to provide answers this [c]ourt required in determining what was in the child's best interests. Neither this [c]ourt nor [CYS] possess the requisite expertise in determining the costs of [Child]'s long-term care and whether his parents could adequately care for him if they ever regain custody. [CYS] did not propose cheaper alternatives, and [CYS] did not suggest this [c]ourt's inquiry was unnecessary or fruitless. Instead, [CYS] only confirmed this [c]ourt's view that the parents would have difficulty procuring the necessary funding for [Child]. [CYS] similarly failed to present evidence concerning [Child]'s alleged trust and whether this funding could be used to employ a life care planner.

This [c]ourt is cognizant of [CYS]'s limited budget. This [c]ourt's ruling did not set a precedent that [CYS] must pay for a life care planner for every single dependent child, but rather that it was in

the best interest of [Child], given [Child]'s unique circumstances, for a life care planner to assess [Child]'s future. With the Juvenile Act's directives, this [c]ourt was compelled to do so.

Trial Ct. Op. at 3-6 (footnotes omitted).

Based on the foregoing, we agree with the trial court that Child's situation presented a unique situation in which a determination of the Child's future expenses, and Mother and Father's ability to meet such expenses, was critical for a reasoned consideration of the Child's best interests. Although CYS points out that the trial court's ruling was unexpected, CYS did not object nor present argument to the trial court to explain why funding the life care planner was infeasible nor did it propose alternatives at the hearing. *See Tameka M.*, 580 A.2d at 752-53; *J.R.*, 875 A.2d at 1118. Given the unique circumstances of this case, we find no basis to disturb the trial court's ruling that the retention of a life care planner, paid for by CYS, was in Child's best interest.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: _7/7/2021_